**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X          **18-CV-2211 (RPK) (JAM)**
IN THE MATTER OF THE ESTATE OF GEORGE
HOMER TILLMAN III BY ANTOINETTE TILLMAN,
INDIVIDUALLY AND AS ADMINISTRATRIX OF
THE ESTATE,

                              Plaintiff,

                 -against-

THE CITY OF NEW YORK, THE NEW YORK CITY
POLICE DEPARTMENT, SERGEANT THOMAS
SORRENTINO, Shield #5635, POLICE OFFICER
MICHAEL RENNA, Shield #6389, and POLICE
OFFICER MATEUSZ KRZEMINSKI, Shield #29908, as
Police Officers and Individually,

                            Defendants.
-----------------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, QUALIFIED IMMUNITY, A NEW TRIAL AND REMITTITUR

Brian J. Isaac
Pollack, Pollack, Isaac & DeCicco, LLP
250 Broadway, Suite 600
New York, New York 10007
Tel: 212-233-8100
bji@ppid.com

***Special and Appellate Counsel to***

Liakas Law, PC
***Attorneys for Plaintiff***
40 Wall Street, 50th Floor
New York, New York 10005
Tel: 212-937-7765
crohme@liakaslaw.com

# TABLE OF CONTENTS

**PAGE**

**TABLE OF CONTENTS**……………………………………………………………………i

**TABLE OF AUTHORITIES**………………………………………………………………iii

**PRELIMINARY STATEMENT**…………………………………………………………...1

**RELEVANT BACKGROUND FACTS AND PROCEDURAL HISTORY**…………………...2

**RELEVANT EVIDENCE PRESENT AT TRIAL**……………………………………………3

**Subsection A: Plaintiff's Account**……………………………………………………………3

**Subsection B: Defendants' Account**……………………………………………………………6

**THE JURY CHARGE**………………………………………………………………………...8

**THE JURY'S VERDICT**……………………………………………………………………9

**LEGAL ARGUMENT**…………………………………………………………………….....10

**POINT I: THE JURY PROPERLY CONCLUDED THAT OFFICER KRZEMINSKI'S USE AND DEGREE OF DEADLY FORCE AGAINST MR. TILLMAN WAS OBJECTIVELY UNREASONABLE**……………………..………………………………………………………10

**POINT II: PURSUANT TO FEDERAL RULES 50 AND 59, OFFICER KRZEMINSKI IS NOT ENTITLED TO HAVE THE LIABILITY VERDICT SET ASIDE, NOR IS HE ENTITLED TO A NEW TRIAL**……………………………………………………..………12

**Subsection A: The Stand of Review on a Rule 50 Motion for Judgment as a Matter of Law**……………………………………………………………………………………………12

**Subsection B: The Legal Standard for Granting a New Trial Pursuant to Fed. Rule 59**………………………………………………………..………………………………13

**Subsection C: The Applicable Case Law Compels the Court to Deny Defendants' Motion**……………………………………………………………..………………………14

**POINT III: OFFICER KRZEMINSKI IS NOT ENTITLED TO QUALIFIED IMMUNITY**………………………………………………………..………………………17

**POINT IV: THERE IS NO VALID BASIS FOR THIS COURT TO DISTURB/REDUCE THE JURY'S AWARDS OF COMPENSATORY AND PUNITIVE DAMAGES**…………...22

**Subsection A: The Court Should Uphold the Jury's Award of Compensatory Damages**……22

**Subsection B: The Court Should Uphold the Jury's Punitive Damages Award of $1 Million**………………………………………………………………………………...23

**CONCLUSION**………………………………………………………………...……..25

# TABLE OF AUTHORITIES

**PAGE**

## CASES AND STATUTES

Federal Rule of Civil Procedure 50……………………………………………………1, 12, 13, 14

Federal Rule of Civil Procedure 59…………………………………………………..1, 12, 14, 15, 16

42 U.S.C. §1983……………………………………………………………………………...2

Adedeji v. Hoder, 935 F. Supp. 2d 557 [EDNY 2013]……………………………………20

Anderson v. Creighton, 483 U.S. 635 [1987]……………………………………………...18

BMW of N. Am. v. Gore, 517 U.S. 559 [1996]…………………………………………….23

Bradway v. Gonzales, 26 F.3d 313 [2d Cir. 1994]………………………………………...18

Callahan v. Wilson, 863 F.3d 144 [2d Cir. 2017]……………………………………3, 10, 11, 18

Cash v. County of Erie, 654 F.3d 324 [2d Cir. 2011]……………………………………...13

Chamberlain v. City of White Plains, 960 F.3d 100 [2d Cir. 2020]……………………….18

Collado v. City of New York, 396 F. Supp. 3d 265 [SDNY 2019]……………………..23, 25

Consorti v. Armstrong World Indus., 72 F.3d 1003 [2d Cir. 1995]……………………….24

Consorti v. Armstrong World Indus., 518 U.S. 1031 [1996]……………………………...24

Cross v. NYCTA, 417 F.3d 241 [2d Cir. 2005] …………………………………………...13

DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124 [2d Cir. 1998]………………….13

Edwards v. Quiros, 986 F.3d 187 [2d Cir. 2021]………………………………………….12

Ekukpe v. Santiago, 823 F. App'x 25 [2d Cir. 2020]……………………………………...20

Estate of Tillman v. City of New York, 18-CV-2211 (RPK) (RER) [EDNY 2022]……………18

Ferguson v. City of New York, 73 AD3d 649 [1st Dept. 2010]……………………………24

Fox v. TBTA, 462 F. Supp. 3d 241 [EDNY 2020]………………………………………...12

Graham v. Connor, 490 U.S. 386 [1989]………………………………………………….10

Graham v. Connor, 928 F. Supp. 2d 610 [EDNY 2013]…………………………………...10

Guzman v. Jay, 303 F.R.D. 186 [SDNY 2014]……………………………………………23

Herrera-Amador v. Police Officer Kevin Lee, 2024 U.S. Dist. LEXIS 91984 [EDNY May 22, 2024]………………………………………………………………………………………..25

ING Glob. V. UPS Oasis Supply Corp., 757 F.3d 92 [2d Cir. 2014]………………………15

Jackson v. Tellado, 295 F. Supp. 3d 164 [EDNY 2018]…………………………………...14

Jennings v. Yurkiw, 2018 U.S. Dist. LEXIS 18602 [EDNY 2021]…………………………...15, 23

Jones v. Treubig, 963 F.3d 214 [2d Cir. 2020]…………………………………………...18, 21

Kirsch v. Fleet St. Ltd., 148 F.3d 149 [2d Cir. 1998]……………………………………...22

Lee v. Edwards, 101 F.3d 805 [2d Cir. 1996]……………………………………………..23

Matter of 91st St. Crane Collapse Litig., 154 AD3d 139 [1st Dept. 2017]…………………………23

Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163 [2d Cir. 1980]………………13

Mazyck v. Long Island R.R., 896 F. Supp. 1330 [EDNY 1995]…………………………………22

Metromedia Co. v. Fugazy, 983 F.2d 350 [2d Cir. 1992]……………………………………14

Papineau v. Parmley, 465 F.3d 46 [2d Cir. 2006]…………………………………………10

Piesco v. Koch, 12 F.3d 332 [2d Cir. 1993]……………………………………………….14

Rizk v. Mehirdel, 2022 U.S. Dist. LEXIS 182604 [EDNY 2022]………………………….18

Rolkiewicz v. City of New York, 442 F. Supp. 3d 627 [SDNY 2020]………………………18

Rose v. City of Utica, 777 F. App'x 575 [2d Cir. 2019]……………………………………22

Ryduchowski v. Port Auth., 203 F.3d 135 [2d Cir. 2000]…………………………………13

Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371 [2d Cir. 2000]………………………………13

Smith v. Lightning Bolt Prods., 861 F.2d 363 [2d Cir. 1988]………………………………13

Soto v. City of New York, 283 F. Supp. 3d 135 [SDNY 2017]……………………………22

<u>Tardif v. City of New York</u>, 13-CV-4056 (KMW) [SDNY 2022]…………………………………10

<u>Tenn. v. Garner</u>, 471 U.S. 1 [1985]…………………………………………………………..10

<u>Tesser v. Bd. of Educ.</u>, 190 F. Supp. 2d 430 [EDNY 2002]…………………………………13

<u>Thomas v. Wellenreuther</u>, 2021 U.S. Dist. LEXIS 96804 [EDNY 2021]……………………..15, 18

<u>Tracy v. Freshwater</u>, 623 F.3d 90 [2d Cir. 2010]………………………………………..10

<u>Wheatley v. Ford</u>, 679 F.2d 1037 [2d Cir. 1982]…………………………………………22

**PRELIMINARY STATEMENT**

Plaintiff submits this memorandum of law in opposition to the motion for judgment as a matter of law, qualified immunity, a new trial and remittitur pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure ("FRCP") on the grounds that defendant Police Officer Mateusz Krzeminski ("PO KRZEMINSKI") is entitled to judgment as a matter of law because he was justified in using deadly force, is entitled to qualified immunity at a minimum and the jury's damage award must be vacated, set aside as unsupported by the evidentiary record and the law, or remitted.

The Court should affirm the jury's verdict and damage awards and deny defendants' instant motion in its entirety. The jury heard multiple days of eyewitness and expert witness testimony, and evaluated an abundance of evidence including surveillance footage, numerous diagrams and the decedent's autopsy report. The jurors, faced with completely contradictory accounts of what transpired on the night defendant police officers shot and killed MR. GEORGE TILLMAN III ("GEORGE"), and having to determine and resolve the credibility of each witness, and the weight to give the rest of the evidence, flatly rejected defendants' version of events as incredible, and instead accepted the very different and far more credible version testified to by two totally neutral, disinterested witnesses with no stake in the outcome of the case.

The jury's verdict that PO KRZEMINSKI did not have reasonable cause to shoot GEORGE, and that his conduct was not entitled to qualified immunity, are entitled to great deference and should be upheld rather than set aside. Furthermore, because the jury's compensatory and punitive damage awards are not in any manner out of line in an improper-use-of-deadly-force case (let alone "shocking to the conscience"), they should be upheld rather than

1

remitted. Indeed, for all of the reasons discussed in greater detail below, the court should uphold the jury's verdict and damages awards.

## RELEVANT BACKGROUND FACTS AND PROCEDURAL HISTORY

Plaintiff ANTOINETTE TILLMAN ("ANTOINETTE") brought this Wrongful Death/Civil Rights (42 U.S.C. §1983) action on behalf of herself and GEORGE'S estate after TILLMAN died as a consequence of being shot in the head, back, and back of his legs, with eleven (11) bullets, when three New York City police officers (defendants POLICE OFFICER MATEUSZ KRZEMINSKI, SERGEANT THOMAS SORRENTINO, and POLICE OFFICER MICHAEL RENNA) opened fire on him during a chase. Defendant KRZEMINSKI, who was out in front, leading the pack of officers, is the officer who fired the first shot at GEORGE, prompting the others to follow suit.

The parties offered entirely contradictory accounts, and because the officers killed GEORGE, he was not at trial to testify regarding his own version of the events in question. Virtually the only undisputed facts with regard to the night the officers killed GEORGE are that (1) the police officers, at approximately 1:00 AM, initially approached and confronted GEORGE as he was standing beside his parked car near 116th Street in South Ozone Park, Queens, holding a container of alcohol, (2) GEORGE fled from the police, (3) after Defendants shot and killed GEORGE, a small (.40-caliber) weapon was recovered from the scene, that was not registered to GEORGE (Defs.' 56.1, ECF Doc. 48.1,¶144; Pl.'s 56.1, ECF Doc. 49.1, ¶144) that had GEORGE'S blood and DNA on it (but not in the areas it would have been in had he been preparing to shoot it), and (4) Defendants exercised exclusive control over the crime scene in the immediate aftermath of this fatal shooting.

During the course of the litigation, Defendants moved for summary judgment, which this Court denied in all respects (ECF Doc. 54) upon finding numerous disputed issues of fact. In its Order and Decision, this Court remarked that whether the officers used excessive force depended on whether their use of force was "'objectively reasonable" in light of the facts and circumstances confronting them, and that in the Second Circuit an officer may use deadly force to stop a fleeing suspect **if and only if** the "officer had probable cause to believe that the individual posed a significant threat of death or serious physical injury to the officer or others." (Citing <u>Callahan v. Wilson</u>, 863 F.3d 144, 152 [2d Cir. 2017].

This Court, in its Order and Decision denying defendants' motion for summary judgment, held that a jury crediting plaintiff's evidence in opposition to the motion could conclude that the officers shot a fleeing GEORGE under circumstances that defendants themselves conceded would have violated clearly established Constitutional law and controlling caselaw that prohibits the use of excessive force, i.e., that they shot a fleeing suspect in the back, even though he was not pointing a gun at them and posed no significant imminent threat to their safety or to the public.

### RELEVANT EVIDENCE PRESENTED AT TRIAL

Subsequent to the court's denial of Defendants' motion for summary judgment, the action proceeded to trial in November of 2024, where the parties offered the same contradictory accounts of what led the defendants to fatally shoot GEORGE (in the head, back and back of his legs) on April 17, 2016. As early as the parties' Opening Statements it was clear that the jury would have to resolve issues of credibility as between the defendant officers and the plaintiff's witnesses.

### A.     Plaintiff's Account

It was plaintiffs' position at trial that GEORGE either did not have a gun on him at all, or that he had a gun, but never did he pull it from his waistband, turn around and point it at the officers

as he was running away from them. Because GEORGE obviously could not testify as a witness to what transpired on the night Defendants killed him, plaintiff was limited to offering the only other eyewitness testimony available, which was from two, other, non-party witnesses. Plaintiff called Darla Lawson who did not see the encounter but testified that she ran out of her house in its immediate aftermath to see what the commotion was about. At that time, she saw an agitated officer, jumping up and down in front of the house next door to hers, exclaiming "I fucked up, I fucked up, I fucked up" (Defendant's Exhibit A, Trial Transcript, p. 823:10-14).

Plaintiff also produced the sole known eyewitness, Leroy Burt, who lives on the street where the incident occurred, and who observed the events from the second story window of his home (Id. at 966:23). Mr. Burt testified that he was awoken when he heard someone shouting, "drop the gun, drop the gun, drop the gun". He got up, looked out the window down to the street below, and saw GEORGE running up the street. He then heard a shot fired (Id. at 966:10, 969:2, 967:2-3, 970:20). He saw one of the officers shoot GEORGE, at which time he fell to the ground (Id. at 972:4-6). He then saw GEORGE on the ground, and saw a gun as well, on the pavement (**not** in GEORGE'S hand) (Id. at 967:21-23). He then observed that "the cops came and pick it up" (Id., 975:1-13). He subsequently reiterated that he never saw GEORGE holding a gun in his hand but rather, that he saw a gun "in front of his hand, out -- out on the -- the pavement" (Id. at 968:18-19), and then he saw an officer come over and pick it up (Id. at 969:2). He again clearly confirmed on multiple, additional occasions, that he never saw GEORGE running with a gun in his hand and only saw a gun for the first time, on the ground, after the shooting (Id. at 972:2-3, 973:6-7). He also testified quite clearly and explicitly that as he saw GEORGE running up the street, GEORGE did not turn around and try to shoot at the officers:

> A:      I did not see him attempt to shot the cop neither. He wasn't attempting to do that. He didn't try to shoot the cop.

> Q:     You are saying you didn't see Mr. Tillman attempt to point a gun at the police?
>
> A:     No, he did not.

(Id. at 973:8-14)

Confirming Ms. Lawson's testimony, Mr. Burt also testified that immediately after the shooting incident he heard an officer exclaim the following:

> A:     Oh. What the fuck. What I did?
>
> Q:     Do you think the police were saying what the fuck, what did I do?
>
> A:     Look what I did. (Id. at 973-21-25, 974;1-2. See also, 974:20)

Additionally, plaintiff produced a DNA expert, J Schlesser-Perry, who testified that while GEORGE'S DNA was found on the gun recovered from the bloody crime scene, it was not found on the trigger or trigger guard, where it would have been if GEORGE were holding it in his hand, pointing it at someone (Id. at 945:15-17). Plaintiff also offered testimony from a ballistics expert, David Balish, that based upon the bullet patterns, the officers shot at GEORGE, including the shot to his head (GSW "A"), when he was already on or partially on the ground (and therefore in no manner an imminent threat to anyone's safety) (Id. at 523:16-21,524:12-15, 530:16-20, 545:5-9, 579-580). Additionally, Dr. Kristen Landi, a medical examiner for the City, who performed GEORGE'S autopsy on behalf of the NYPD, conceded it was highly unlikely given the bullet injuries to GEORGE'S back, neck, and the back of his legs, that the incident could have occurred as defendants' claimed; GEORGE would have been unable to turn around or use his right hand to hold and point a gun at the officers (Id. at 448, 449-450, 818). Additionally, she testified the fatal shot to his head, and which was not even the first shot, would not have killed him immediately (Id. at 409).

In her summation after the parties rested, plaintiff's counsel recounted the testimony and evidence, and that the officers had four hours together in the hospital to discuss what had just occurred, compare notes, and get their stories straight (Id. at 1057:15-18, 1058). Plaintiff's counsel asked the jury to consider whether they believed the officers' account that the evidence demonstrated plaintiff really posed a serious threat to them or others, or whether they "shot a man in the back. Not once, not twice, not three times, not four times, not five times, more than that. 13 shots at George Tillman and for what? For what? A bottle of vodka in the street? Because he was double-parked?" (Id. at 1056-1066,1150).

Counsel also reminded the jury of the acrobatics and gymnastics it would have taken on GEORGE'S part in order for him to have contorted his body in the manner the officers claimed, in order to point a gun in their direction; it is extremely implausible that a person can be shot in the back while simultaneously turning his torso forwards in order to take a shot at someone, and especially so if they are already suffering from the injuries caused by gun shot wounds to the neck and back (Id. at 1058-1059, 1071:1-6), and further, that (1) the inconsistencies in the officers' stories as to specific, actual mechanics of the deadly altercation (aside from their unified claim that GEORGE turned toward and pointed a gun at the officers) and (2) the fact that defendants initially had exclusive control over the crime scene, all just gave rise to more questions about what really had occurred (Id. at 1060-1061). Counsel also reminded the jury that even though PO KRZEMINSKI testified that he saw a "bulge" beneath GEORGE'S shirt that he believed was a gun, none of the other officers had noticed that (Id. at 1062:16-25).

**B.    Defendants' Account**

According to defendants' Opening Statement (Id. at 25), "Mr. Tillman had a gun, he ran from the defendants, they chased him, and then when he turned the gun toward them, he was

unfortunately killed." During the course of the trial, the defendant officers, all four of them, stuck to that same story (Id. at 1056:10-13). PO KRZEMSKI testified that on the night in question, he and fellow officer, non-party Sergeant Arnold were patrolling the South Ozone Park area of Queens in two separate unmarked cars—one occupied by defendants SGT. SORRENTINO, PO STALLONE and PO RENNA and the other by PO KRZEMINSKI and ARNOLD (Id. at 64-65), when they saw GEORGE standing near the driver side door of a double-parked SUV, holding a partially empty bottle of vodka in his hand (Id. at 86:11). He further testified that he and Arnold pulled up alongside GEORGE'S car and told him he should not be holding an open bottle in the middle of the street or be driving if he was intoxicated (Id. at 166:17, 167:14, 235:3-10). GEORGE acknowledged the officers and handed the bottle off to someone else (Id.).

PO KRZEMINSKI claimed that at that time he noticed beneath the plaintiff's shirt a bulge in the shape of a gun, significantly bigger than his own, protruding from the waistband of GEORGE'S pants and alerted his partner (Officer Arnold[1]) to it (Id. at 115-116, 166, 236, 151, 168). Arnold then shined his flashlight on GEORGE'S waist (Id. at 175). At that point, plaintiff began to walk away from the officers but then took off running northbound (Id. at 179, 176), prompting PO KRZEMINSKI and Sgt. Arnold to chase him up the sidewalk (Id. at 170). Defendants further testified that SGT. SORRENTINO, PO STALLONE and PO RENNA were patrolling in the same area and happened upon the scene as the chase was heading directly at them. (Id. 602: 4, 611:7, 853: 25, 869: 21). They stopped their car and heard PO KRZEMINSKI and Sgt. Arnold yelling that GEORGE had a gun (Id., and 697:5, 699:3). According to Defendants, as GEORGE made a left hand turn onto 116th Avenue (Mr. Burt and Ms. Lawson's street), he pulled

---

[1] Officer Arnold is not a party defendant because he never shot at GEORGE.

out his gun, he was holding it in his right hand, the officers yelled at him to drop it, but he refused to do so (Id. at pp. 184:8-21; 271:15-24, 613:2-8, 702:2-22, 871:6-17, 708:1-7; 966:10, 967:3).

As the officers continued to chase GEORGE, they claim he suddenly started to turn his body left—counter-clockwise (southbound) (Id. 136:16, 138:14, 184:8, 189:15, 309:7, 314:3, 627:10, 642:21, 668:1, 676:19; 708:25, 717:11, 746:13, 752:1, 872:9, 883:3), and, as he turned, pointed his gun, which was in his right hand, at PO KRZEMINSKI, at which time PO KRZEMINSKI fired six shots in response (Id.). The other officers each fired 2-3 shots as well (Id.). Defendants further testified that after the shooting, while GEORGE was on the ground, PO RENNA kicked the gun out of GEORGE'S right hand and remained standing by the gun until he was relieved by a responding officer (Id. at 140, see also 884:22, 888:6).

Defendants also relied upon a confusing, and incomplete autopsy report as well as confusing ballistics testimony that contravened other expert testimony (Id. at pp. 539:3-6, 540:7-9, 551:7-11) in an effort to convince the jury that the patterns made by the numerous bullets which struck and killed GEORGE could only be consistent with the officers having fired shots at him at a time when he was pointing a gun at PO KRZEMINSKI. In his summation, defense counsel adhered to defendants' "party line," advancing their position that they only shot at GEORGE because he had a gun in his hand, pointed at PO KRZEMINSKI (Id. at 1084).

**THE JURY CHARGE**

Before the case went to the jury, the Court charged the jury with very clear instructions that specifically acknowledged "The parties here dispute what happened" (Id. at 12) and that therefore, "In this case, the plaintiff has asked you to draw one set of inferences, while the defendants have asked you to draw another set of inferences, based on the same evidence. Whether a given inference is or is not to be drawn is entirely a matter for you, the jury, to decide." The charge also

8

reminded the jurors that they were the sole judges of the credibility of the witnesses and of the weight to be assigned to their testimony. The charge also included instructions regarding interested witnesses (Id. at 1137), the need to evaluate each officers' actions separately/independently (Id. at 1138:8-15), and the various applicable burden of proof (more likely than not/preponderance of the evidence) and legal standards for liability and damages (Id. at 1140-1144).

## THE JURY'S VERDICT

On November 27, 2024, the jury, having concluded that plaintiff proved by a preponderance of the evidence, i.e., that it was more likely than not that GEORGE was unreasonably and unconstitutionally subjected to excessive, deadly force, returned a liability verdict in plaintiff's favor. The verdict is against PO KRZEMINSKI only, and not against the remaining defendant officers who were following behind him, and further away from GEORGE, and following PO KRZEMINSKI's lead as he chased after GEORGE, shouting repeatedly that he had a gun. The jury concluded that these officers, who shot at GEORGE many fewer times that KRZEMINSKI, had not subjected GEORGE to excessive deadly force (Id. at 1174-1175; ECF Doc. 121-3, p. 1299).

While defense counsel questioned the court about the claimed "inconsistency" in the jury's liability verdict, i.e, how it could find liability against PO KRZEMINSKI, but not against the other defendants, the court responded, "As I sit here in this moment, it doesn't seem like a case where a finding of liability as to one necessarily implies liability as to the others", or vice vera, i.e., that a finding of no liability as to one officer necessarily required a finding of non-liability against all others as well." (Id. at 1178:20-24).

In terms of damages, based upon the evidence, which included extensive testimony from ANTOINETTE (Id. at 1195-1215), the jury awarded $1 million in compensatory damages for PO

KRZEMINSKI'S use of excessive force that did not result in GEORGE'S death (pre-death conscious pain and suffering), $4.3 million in compensatory damages as compensation for the impact GEORGE'S death has made on his wife and children (the permanent loss of their husband and father, who was by all accounts a healthy man in his early 30's when he was killed), and $1 million in punitive damages (Id. at 1275-1276).

## LEGAL ARGUMENT

### POINT I

### THE JURY PROPERLY CONCLUDED THAT OFFICER KRZEMINSKI'S USE AND DEGREE OF DEADLY FORCE AGAINST MR. TILLMAN WAS OBJECTIVELY UNREASONABLE

An excessive force claim that arises out of a police arrest invokes the Fourth Amendment prohibition against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 [1989]. To determine whether the force an officer uses to effectuate an arrest is reasonable under the Fourth Amendment, "[a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests, against the importance of the governmental interests alleged to justify the intrusion" (Tenn. v. Garner, 471 U.S. 1 [1985]).

The question is whether the officer's use of force was "objectively reasonable." (Id., Graham v. City of New York, 928 F. Supp. 2d 610, 617 [EDNY 2013][2]. The factfinder examining an excessive force claim must consider at least these three factors: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." (Tracy v. Freshwater, 623 F.3d 90, 96 [2d Cir. 2010][3] (emphasis added)).

---

[2] citing Tracy v. Freshwater, 623 F.3d 90, 96 [2d Cir. 2010], Tardif v. City of New York, 13-CV-4056 (KMW) [SDNY 2022], Callahan v. Wilson, 863 F.3d 144 [2d Cir. 2017].
[3] citing Graham, 490 U.S. at 396, Papineau v. Parmley, 465 F.3d 46, 61 [2d Cir. 2006]).

According to <u>Callahan</u> (863 F.3 144), and as this court explicitly acknowledged in its denial of defendants' motion for summary judgment, it is objectively unreasonable for an officer to shoot at a fleeing suspect unless the suspect is wielding and pointing a gun at someone.

Here, based upon the evidence at trial, the jury, weighing the credibility of the parties and witnesses, justifiably concluded that at the time PO KRZEMINSKI shot at GEORGE six times, he possessed no reasonably objective belief that GEORGE posed any imminent safety threat to him or to anyone else, because he was not pointing a gun at PO KRZEMINSKI; the jury chose to believe the neutral, disinterested witnesses and to reject as incredible, the collusive, implausible, and self-serving testimony of the officers themselves, who are the only people alive that know exactly what happened, and had every incentive to lie about it. The jury also gave little weight to the confusing, ambiguous and conflicting ballistics and autopsy evidence/testimony, all of which was performed after the fact and with no personal knowledge.

While defendants argue there can be no legitimate finding that PO KRSEMINSKI unreasonably used excessive force upon GEORGE given the jury's conclusion that the other officers had not (and were therefore entitled to qualified immunity), and that there is no distinction between their conduct and PO KRZEMINSKI'S, that simply is not the case, as noted above, the court stated during trial that this "did not appear to be a case where a finding of liability as to one necessarily implies liability as to the others" (Id. at 1178), or vice versa, i.e., that a finding of no liability as to one necessarily requires a finding of no liability against all others.

Indeed, it is not at all uncommon for juries to conclude that some officers had probable cause or exercised an objectively reasonable amount of force while others did not, and the court specifically instructed the jury to consider each officer's conduct individually. Here, it was undisputed that as the officers were chasing GEORGE, PO KRZEMINSKI was out in in the lead,

closest to GEORGE, relative to the other officers, and therefore in the best (or better) position to see whether GEORGE was in fact turning toward him with a gun pointed at him, or not. The other officers were relying on him because he had the best vantage point, and it was his first shot, and his repeated claims that GEORGE had a gun in his hand, that triggered the same reaction from the other officers. Defendants themselves concede "There is no dispute that defendant Krzeminski was the closest to GEORGE — based on the testimony of all of the officers present and the available incident video (Defendants' Memorandum of Law, ECF Doc. 121-1, p. 12). Furthermore, PO KRZEMINSKI fired and hit GEORGE six times, more than twice the number of times of any other officer.

Since, as discussed below, there is no valid basis for setting aside the verdict pursuant to Fed. R. Civ. P. 50, or for the Court to order a new trial pursuant to Fed. R. Civ. P. 59, or for qualified immunity to apply to PO KRZEMINKI, the Court should deny defendants' motion in its entirety.

## POINT II

### PURSUANT TO FEDERAL RULES 50 AND 59, OFFICER KRZEMINSKI IS NOT ENTITLED TO HAVE THE LIABILITY VERDICT SET ASIDE, NOR IS HE ENTITLED TO A NEW TRIAL

**A.     The Standard of Review on a Rule 50 Motion for Judgment as a Matter of Law**

Judgment as a matter of law, i.e., setting aside the jury's verdict, is only appropriate when "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it. <u>Edwards v. Quiros</u>, 986 F.3d 187 [2d Cir. 2021][4]. This is a

---

[4] See also, <u>Fox v. TBTA</u>, 462 F. Supp. 3d 241, 244 [EDNY 2020].

very stringent standard, it underscores the strong deference federal courts give to jury verdicts, and neither of the above criterion are satisfied.

Indeed, when considering a Rule 50 motion, the court cannot assess the weight of conflicting evidence or substitute its own judgment for that of the jury. Rather, it must make all credibility determinations and draw all inferences in favor of the non-movant (here, Plaintiff). <u>Sharkey v. Lasmo (AUL Ltd.)</u>, 214 F.3d 371, 374 [2d Cir. 2000][5]. And, the movant's burden of proof is "is 'particularly heavy' where, as here, 'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant." <u>Cash v. County of Erie</u>, 654 F.3d 324, 333 [2d Cir. 2011][6]. Indeed, Courts in the Eastern District and the Second Circuit regularly refuse to second-guess juries' findings/determinations/resolution of a witnesses or party's credibility. See, e.g., <u>Tesser v. Bd. of Educ.</u>, 190 F. Supp. 2d 430 [EDNY 2002][7].

**B.    The Legal Standard for Granting a New Trial Pursuant to Fed. Rule 59**

A motion for a new trial, pursuant to Fed. R. Civ. P. 59, may be granted when the District Court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." <u>Smith v. Lightning Bolt Prods.</u>, 861 F.2d 363, 370 [2d Cir. 1988]. Although the standard for a new trial is more lenient than that for setting aside a jury verdict, the Second Circuit has cautioned that a trial court "should rarely disturb a jury's evaluation of a witness's credibility." <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 134 [2d Cir. 1998]. Therefore**,** "[w]here the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."

---

[5] See also, <u>Smith v. Lightning Bolt Prods.</u>, 861 F.2d 363, 367 [2d Cir.1988]; <u>Mattivi v. South African Marine Corp., "Huguenot"</u>, 618 F.2d 163, 167-168 [2d Cir.1980].
[6] quoting <u>Cross v. NYCTA</u>, 417 F.3d 241, 248 [2d Cir. 2005].
[7] See also, <u>Ryduchowski v. Port Auth.</u>, 203 F.3d 135, 142 [2d Cir. 2000] [holding District Court erred in setting aside jury verdict and entering judgment as a matter of law].

Metromedia Co. v. Fugazy, 983 F.2d 350, 363 [2d Cir. 1992]; Piesco v. Koch, 12 F.3d 332, 345 [2d Cir.1993] (emphasis added).

**C.      The Applicable Caselaw Compels the Court to Deny Defendants' Motion**

Numerous relevant cases provide excellent examples of Rules 50 and 59 at work in the specific context of excessive/deadly force cases, and the deference courts give jury verdicts, particularly where, as here, the jury is required to resolve issues of credibility and accept one side's version of the facts and correspondingly reject the opposing party's position. For example, in Jackson v. Tellado, 295 F. Supp. 3d 164 [EDNY 2018], the jury returned a verdict in favor of plaintiff on his claims under 42 U.S.C. §1983 against multiple NYPD Officers, upon determining that Plaintiff had been falsely arrested and subjected to excessive force. It awarded plaintiff a multi-million-dollar compensatory damages verdict and substantial punitive damages. Pursuant to a post-trial Order, the trial court held that none of the Defendants who were found liable for using excessive force were entitled to qualified immunity for the excessive force verdicts against them (Id.) Defendants thereafter filed a Rule 50/59 motion.

In evaluating the prong of defendants' motion seeking judgment as a matter of law (Rule 50), the court recited the above-cited legal standards and then observed that the witnesses and parties offered "differing accounts" that "varied widely", with regard to what had transpired (Id. at *16). The court concluded that "Based on the evidence introduced at trial, and notwithstanding conflicts in that evidence", it was reasonable for the jury to have concluded that the officer unreasonably used excessive force. According to the court, it was "fully within the jury's fact-finding discretion to credit portions of Plaintiff's testimony (while necessarily discrediting other testimony)." Id. The court therefore upheld the jury's verdict.

With regard to defendants' additional request for a new trial pursuant to Rule 59, the Court found that "the jury ultimately credited Plaintiff's testimony or other evidence, including his witnesses' testimony, over Defendants' testimony, and that its verdict turned substantially on the evaluation of the parties' credibility."[8] The court therefore denied that portion of the defendants' motion, as well.

<u>Thomas v. Wellenreuther</u>, 2021 U.S. Dist. LEXIS 96804 [EDNY 2021] similarly involved a Rule 50 and 59 motion to set aside a jury verdict against a police officer, and for a new trial, in a situation where a police officer shot someone in the back of the neck. The parties and witnesses provided contradictory accounts of what led up to the shooting, just as in the case at bar. The court held that "from the perspective of a reasonable police officer, based upon the facts and circumstances as found by the Court above, the use of deadly force at the time of the Second Gunshot was objectively unreasonable and therefore in violation of the plaintiff's Constitutional Rights" (and to wit, even though the plaintiff had threatened violence toward the officer prior to the officer shooting at him).[9]

The identical result is warranted here under the auspices of <u>Jackson</u>, <u>Thomas</u> and <u>Jennings</u> (footnote 9) courts denied the defendant officers' Rule 50/59 motions. With regard to Fed. Rule 50, the evidence and testimony reflect that there is not (not hardly) "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable

---

[8] (Citing <u>ING Glob. v. UPS Oasis Supply Corp.</u>, 757 F.3d 92, 99 [2d Cir. 2014] [denying Rule 59 motion where evidence offered at trial largely consisted of witness testimony because although there was some evidence contrary to the jury's finding, the jury was free to reject that evidence and accept evidence presented by other witnesses]).

[9] And see also, <u>Jennings v. Yurkiw</u>, 2018 U.S. Dist. LEXIS 186602 [EDNY 2021] [Eastern District of New York upheld a jury verdict finding police officers liable for excessive force (and not entitled to qualified immunity), where "the parties' respective narratives sharply diverge"].

and fair minded [persons] could not arrive at a verdict against [it].") And as to Rule 59, because the evidence offered at trial largely consisted of witness testimony, the jury was free to reject and/or accept whichever it found most credible. The court may not disturb the jury's conclusions absent legitimate grounds to do so.

Here, the jury had to choose between one of two very conflicting accounts, and in doing so, had to make decisions, based on the evidence and testimony, as to who was lying and who was telling the truth. It weighed and measured the evidence and credited the non-party, neutral/disinterested witness testimony of Leroy Burt (that plaintiff did not have a gun in his hand and that he did not at any time turn around and point it in the officers' direction), and Darla Lawson (who testified, consistently with Mr. Burt's testimony, that a clearly agitated officer, jumping up and down, repeatedly exclaimed "I fucked up" in the immediate aftermath of the incident), over the completely opposite account/testimony of the officers, who are interested witnesses with a great deal at stake, who spent several hours after the incident, conferring and colluding with one another and get their stories straight, and who had every self-interest in testifying falsely.

The jury also was unpersuaded by, and gave little weight to, the confusing, incomplete (Id. at pp. 50-541,543) autopsy and ballistics evidence, finding that it did not support defendants' implausible claims that during the chase, GEORGE somehow, with his right hand, pulled a gun from the waistband of his pants, twisted his body around to the left, and pointed a gun over his left shoulder at PO KRZEMINSKI, who then shot at him. The jury found this scenario too implausible and was not having it, and chose instead to believe Mr. Burt's unequivocal, and far more believable testimony that GEORGE never had a gun in his hand, and that he never turned around, pointing a gun at the officers.

16

The jury also concluded, based on the evidence, that the mere fact a gun with GEORGE'S DNA on it was recovered from the bloody crime scene, did not translate into a finding that he was actually holding it in his hand at any time, and/or that while he was holding it, he turned around and pointed it. It concluded instead that either the small pistol found at the scene was not his (the jury heard testimony from PO KRZEMINSKI that the gun he thought he saw under GEORGE'S shirt was "significantly bigger" than his own), or that the officers who controlled the scene after the shooting had planted it, or that GEORGE actually did have a gun in his pants that had fallen from his waistband as he fell to the ground after being shot in the back multiple times.  Under the applicable legal standards, its verdict determining that PO KRZEMINSKI possessed no probable cause to shoot at GEORGE, let alone so many times, must be respected and affirmed.

The court must reject defendants' unsupported claim that the liability verdict must be set aside because PO KRZEMINSKI did not fire the lethal bullet (Gunshot Wound A). It does not matter. The jury concluded that PO KRZEMINSKI used deadly force at a time when it was objectively unreasonable for him to do so, and GEORGE died as a consequence of being shot several times. The jury was not required to find that PO KRZEMINSKI fired the fatal shot in order to conclude he had no reasonably objective basis/probable cause to shoot at GEORGE and had violated his Constitutional rights.  Accordingly, the court should affirm the jury's liability verdict.[10]

### POINT III

### OFFICER KRZEMINSKI IS NOT ENTITLED TO QUALIFIED IMMUNITY

"The doctrine of qualified immunity shields public officials performing discretionary functions (like a police officer's use of force while on the job) from civil liability insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable

---

[10] Should the court find some reason to award a new trial, it would have to be awarded against **all** Defendants, not just PO KRZEMINSKI.

person would have known, or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." <u>Rolkiewicz v. City of New York</u>, 442 F. Supp. 3d 627, 643 [SDNY 2020][11] "[W]hen an official raises qualified immunity as a defense, the court must consider whether: (1) ... the official violated a statutory or constitutional right, and (2) ... the right was clearly established at the time of the challenged conduct." <u>Jones v. Treubig</u>, 963 F.3d 214, 224 [2d Cir. 2020].[12]

This court previously addressed the issue of qualified immunity in this very case when it evaluated and denied defendants' motion for summary judgment. <u>Estate of Tillman v. City of New York</u>, 18-CV-2211 (RPK) (RER) (EDNY 2022) (ECF Doc. 54). It remarked that "To overcome qualified immunity, "[t]he contours of the (constitutional) right must be sufficiently clear" at the time of the violation "that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 [1987]. The Second Circuit has held that the principle that deadly force may only be used when officers have probable cause to believe that an individual posed a significant threat of death or serious physical injury is a clearly established one. <u>Callahan</u>[13], 863 F.3d at 152."

Under these principles, according to this very court, defendants were not entitled to summary judgment with regard to their qualified immunity defense, and even defendants conceded during oral argument that "under Callahan and related Second Circuit authority, it was clearly established that officers could not have shot a fleeing Mr. Tillman if he did not have a gun in his hand." And, while the defendants assert that GEORGE had turned toward the officers while

---

[11] quoting <u>Bradway v. Gonzales</u>, 26 F.3d 313, 317-318 [2d Cir. 1994].
[12] See also, <u>Chamberlain v. City of White Plains</u>, 960 F.3d 100, 110 [2d Cir. 2020].
[13] <u>Callahan v. Wilson</u>, 863 F.3d 144 [2d Cir. 2017].

wielding a gun, "a reasonable jury could conclude otherwise based on the account of eyewitness Leroy Burt." Id.

Thomas v. Wellenreuther, 2021 U.S. Dist. LEXIS 96804 [EDNY 2021] also involved a Rule 50/59 motion. The case in involved a police officer who shot the plaintiff in the back of the neck during the course of a confrontation. The parties and witnesses provided contradictory accounts of what led up to the shooting, just as in the case at bar. The court held that "from the perspective of a reasonable police officer, based upon the facts and circumstances as found by the Court above, the use of deadly force at the time of the Second Gunshot was objectively unreasonable and therefore in violation of the plaintiff's Constitutional Rights", and to wit, even though the plaintiff had threatened violence toward the officer prior to the officer shooting at him. With regard to qualified immunity, the court held that it did not apply to the officer's conduct because he could possess no objectively reasonable belief that either the officer or the public was in danger at the time he shot at the fleeing suspect (plaintiff).

In Rizk v. Mehirdel, 2022 U.S. Dist. LEXIS 182604 [EDNY 2022], the court similarly rejected defendant police officer's claim of qualified immunity, refused to usurp the jury's role, and denied the defendants' motion to set aside the verdict/order a new trial, in a situation where the parties offered conflicting accounts of what had transpired when the officer responded to the plaintiffs' domestic dispute. The jury had heard testimony from numerous parties and witnesses, witnessed surveillance video of the incident, and awarded compensatory and punitive damages. The court noted that a police officer's use of force is excessive and in violation of the 4th Amendment if it is objectively unreasonable based on the facts and circumstances confronting him.

Continuing, the court remarked that "Although [t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use

19

of **some** degree of force, . . . it does not give the officer license to use force without limit. Instead, the force an officer uses must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." The Court found that "[d]rawing all inferences in favor of the non-moving party and giving deference to all credibility determinations of the jury, the Court finds that the [Defendants] ha[ve] not established that the evidence is insufficient to permit a reasonable juror to find in [Plaintiff's] favor."

The court further noted that "The jury reviewed video footage of the incident, heard the testimony of the parties, and decided who to credit. Even if the Court would have come to a different conclusion than the jury—a matter on which the Court renders no opinion—the Court cannot set aside the verdict because it disagrees with the jury's reasonable assessment of Rizk's testimony." Id. at 10.[14]

Next, with regard to whether Mehirdel's use of excessive force was entitled to qualified immunity, the court reasoned that the first prong of the above-cited qualified immunity test, i.e., whether defendant violated a statutory or constitutional right—had already been determined in plaintiffs' favor, by the jury, and that there was no basis for the court to disturb the jury's conclusion. The court next observed that the second prong of the qualified immunity test required the court to consider "whether a reasonable officer faced with the same factual scenario that [Sergeant Mehirdel] encountered would have known that his use of force was unreasonable." Adedeji v. Hoder, 935 F. Supp. 2d 557, 569 [EDNY 2013].

Noting the substantial contradictions between the officer's testimony and the plaintiff's testimony, the court held that "Where the circumstances are in dispute, and contrasting accounts . . . present factual issues as to the degree of force actually employed and its reasonableness, a

---

[14] citing Ekukpe v. Santiago, 823 F. App'x 25, 30 [2d Cir. 2020] [denying defendants' motion for JMOL and holding that evidence at trial did not compel finding that Defendants' version of events was true].

defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." Id. at *7. The court further held that taking the facts in the light most favorable to the nonmoving party, "no reasonable officer could [have] believe[d]," in these circumstances, that the amount of force Mehirdel used was reasonable." Id. at *13.

In Jones v. Treubig, 963 F.3d 214 [2d Cir. 2020], the Second Circuit reversed a district court's grant of qualified immunity to a police officer who used a taser twice against the plaintiff, who thereafter brought a civil rights action. Following a trial, a jury found one (but not all) of the officers liable for using excessive force, but the district court set the jury's verdict aside, finding that the officer was entitled to qualified immunity. The Second Circuit reversed this determination and reinstated the jury's verdict, acknowledging that (1) well-established law prohibits a police officer from using significant force against a person who is not posing an immediate threat to the officer or others, and (2) an officer who uses such force is not entitled to qualified immunity.

These cases amply demonstrate that our courts routinely deny claims of qualified immunity to police officers in excessive force cases when there are disputed facts about the reasonableness of the force used, or when the force used clearly violated established law at the time of the incident, and further, that qualified immunity is not an "all or none" type of thing. The Court must reject defendants' specious claim that qualified immunity applies to PO KRZEMINSKI because there is no distinction between his conduct and that of the other officers who were afforded qualified immunity. Distinctions exist and they are critical. PO KRZEMINSKI shot GEORGE 6 times, which is more than twice the number of times of any of the other officers. This is relevant to the second prong of the qualified immunity test which requires consideration of whether a reasonable officer faced with the same factual scenario would have known that his use of force was unreasonable. It was objectively unreasonable for PO KRZEMINSKI to shoot GEORGE six times.

21

Additionally, PO KRZEMINSKI is the **only** defendant who claimed to see GEORGE having a gun in his waistband when he approached him, and it was his words ("He's got a gun!") and observations/perspective/judgment upon which the other officers relied. The jury could have reasonably concluded that the other officers were reasonable in their mistaken belief that the first shots that PO KRZEMINSKI fired were justified and/or that it was GEORGE who fired the initial shots, as they did not think PO KRZEMINSKI would shoot a fleeing man in the back.

Finally, the only cases advanced by plaintiff are inapposite because in <u>Rose v. City of Utica</u>, 777 F. App'x 575, 577 [2d Cir. 2019] (Defendants' Memorandum of Law, p. 16) it was "undisputed" (Id.) there had been reports of plaintiff firing a shotgun inside a public park, that he did not react to an approaching officer's command to drop his weapon, and that he turned toward the officer while still holding the shotgun in his hands. And in <u>Soto v. City of New York</u>, 283 F. Supp. 3d 135, 142 [SDNY 2017" (Defendants' Memorandum of Law, p. 22) it was uncontroverted that the plaintiff charged police with a knife, prompting the officer's gun fire.  In keeping with the above advanced by plaintiff rather than defendants, the court should affirm the jury's verdict.

**POINT IV**

**THERE IS NO VALID BASIS FOR THIS COURT TO DISTURB/REDUCE THE JURY'S AWARDS OF COMPENSATORY AND PUNITIVE DAMAGES**

**A.    The Court Should Uphold the Jury's Award of Compensatory Damages**

In the Second Circuit, a jury's award of damages for Constitutional violations will be upheld unless it is "so excessive 'as to shock the judicial conscience.'" <u>Wheatley v. Ford</u>, 679 F.2d 1037, 1039 [2d Cir. 1982]; <u>Kirsch v. Fleet St. Ltd.</u>, 148 F.3d 149, 165 [2d Cir. 1998]. This is high bar. <u>Mazyck v. Long Island R.R.</u>, 896 F.Supp. 1330, 1336 [EDNY 1995]. The jury's award of compensatory damages ($5.3 million) in this death case is in no way "shocking". Defendants offer not a single analogous case whatsoever, let alone a wrongful death case, to indicate otherwise.

Indeed, in the very case defendants rely on, <u>Guzman v. Jay</u>, 303 F.R.D. 186, 197-198 [SDNY 2014], the court found an award of $2,205,000 million (over 10 years ago, and which would be much greater in today's dollars), was not excessive where the plaintiff was not even killed by police but rather, merely (relatively speaking) maced and slammed into the ground). And in <u>Collado</u>, the other case defendants advance, plaintiff was struck by a single bullet as opposed to eleven (11) bullets. Defendants' comparison of that case to the instant matter is truly offensive. And see, <u>Matter of 91st St. Crane Collapse Litig.</u>, 154 AD3d 139 [1st Dept. 2017] [In wrongful death action arising out of crane collapse, while crane operator was in it, 1st Department holds the appropriate amount of pre-impact terror damages was **$2.5 million**, and an appropriate award for just a few minutes of conscious pain and suffering prior to his death was **$5.5 million**].

## B.     The Court Should Uphold the Jury's Punitive Damages Award ($1 million)

"Punitive damages are available in a §1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Lee v. Edwards</u>, 101 F.3d 805, 808 [2d Cir.1996] (emphasis added). Determining the amount of punitive damages "is a quintessential responsibility of juries," and such awards should not be set aside unless the jury's decision "shock[s] the conscience or amounts to a miscarriage of justice." <u>Jennings v. Yurkiw</u>, 18 F.4th 383, 389-390 (2d Cir. 2021). A district court must look to three "guideposts" when deciding whether a punitive damages award is excessive: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between the amount awarded and the amounts imposed in comparable cases. <u>BMW of N. Am. v. Gore</u>, 517 U.S. 559, 574-575 [1996]; <u>Jennings</u>, 18 F.4th at 390.

In <u>Ferguson v. City of New York</u>, 73 AD3d 649 [1st Dept. 2010], a jury awarded **$2.7** million in punitive damages in a wrongful death case involvig a police officer's unreasonable use of deadly force. The Appellate Division upheld the jury's punitive damage award, finding it was supported by evidence at trial establishing the use of excessive force, as well as conduct that was wanton, reckless and malicious. According to the court:

> [t]he officer's conduct, which "was in complete disregard of police procedure, to say nothing of the decedent's rights (including deprivation of his right to life without due process of law), resulted in the latter's death. Defendants mistakenly rely on cases like *Papa*, which did not involve a scenario where someone was shot and killed. On this record, an award of $2.7 million would be "reasonably related to the harm done and the flagrancy of the conduct" (see e.g. Liberman v Riverside Mem. Chapel, 225 AD2d 283, 292), and consistent with the purpose of punishing a defendant for wanton and reckless acts, thereby discouraging similar conduct in the future (see Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489).

Importantly, the New York state standard is significantly lower than the federal, "shocks the conscience" standard; in state court, a damages award need only "deviate from what can be regarded as reasonable compensation" for the plaintiff's injuries in order for the court to be justified in reducing it. CPLR §5501(c) See, <u>Consorti v. Armstrong World Indus.</u>, 72 F.3d 1003, 1011 [2d Cir. 1995][15] [New York standard is "less deferential to the jury's verdict than the federal standard"]. Accordingly, since the Appellate Division, applying a more lenient standard for remittitur than a federal court, found that $2.7 million in punitive damages (in 2010), in a wrongful death/excessive force case did not deviate from reasonable compensation, then certainly the $1 million in punitive damages awarded to plaintiff in the instant matter in 2025, is not "shocking to the conscience". The court should therefore affirm the jury's punitive damage award.

---

[15] vacated on other grounds, 518 U.S. 1031 [1996].

Finally, the <u>Collado</u>[16] and <u>Herrera-Amador</u>[17] cases advanced by defendants are inapposite and do not support a reduction of the punitive damage award. In <u>Collado</u>, a case involving a police officer's shooting (a single shot) and killing of a man who inserted himself into a physical fight between a plain-clothes officer and suspected drug dealer (the case did not involve a fleeing suspect being shot in the back and killed by police) the jury awarded a total of $14,325,000, a full $10,000,000 of which was punitive damages, i.e., the vast majority of the overall damages award was punitive and almost 2-and-a-half times exceeded the compensatory damage award. Furthermore, the court credited defendants' claim that the officer had "panicked", and therefore his conduct was not necessarily reprehensibly reckless or indifferent.

Shockingly, here, PO KRZEMINSKI shot at plaintiff six (6) times and did not actually panic until **after** the fact when he realized he had "fucked up" (his words). Notably, in <u>Herrera-Amador</u> the officer's "mistake" was far less egregious; he arrested the plaintiff, mistakenly believing he was a robber. Additionally, the punitive damage award was more than twice the compensatory damages. Finally, <u>Herrera-Amador</u> was not a fatal shooting case, whereas here, the jury had every reason to send a message to all NYPD officers that they are not above the law, that they cannot act recklessly, and that they had better be damn sure that a fleeing suspect is actually wielding a gun at them before they take a single shot at him, let alone several.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully submits this Court should all respects uphold the jury's liability verdict and damages awards in their favor and deny Defendants' unfounded motion "Motion for Judgment as a Matter of Law, Qualified Immunity, a New Trial and Remittitur," together with such other and further relief as the Court deems just and proper.

---

[16] <u>Collado v. City of New York</u>, 396 F. Supp. 3d 265 [SDNY 2019].
[17] <u>Herrera-Amador v. Police Officer Kevin Lee</u>, 2024 U.S. Dist. LEXIS 91984 [EDNY May 22, 2024].

Dated:  New York, New York
       February 28, 2025

Respectfully submitted,

BY:    Brian J. Isaac, Esq.
       Pollack, Pollack, Isaac & DeCicco, LLP
       250 Broadway, Suite 600
       New York, New York 10007
       Tel: 212-233-8100
       bji@ppid.com

       ***Special and Appellate Counsel to***

       Liakas Law, PC
       ***Attorneys for Plaintiff***
       40 Wall Street, 50th Floor
       New York, New York 10005
       Tel: 212-937-7765
       crohme@liakaslaw.com